**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **KATRINA KELLY,** ) | |
|     *Plaintiff* ) | |
| ) | Civil Action No._____ |
| **MARKWAYNE MULLIN, Secretary,** ) | |
| **Department of Homeland Security** ) | **JURY TRIAL DEMANDED** |
|     *Defendant(s).* ) | |

**Serve:**

**Office of the General Counsel**
**U.S. Department of Homeland Security**
**245 Murray Lane, SW**
**Mail Stop 0485**
**Washington DC 20528-0485**

**Attorney General of the United States**
**Todd Blanche**
**U.S. Department of Justice**
**950 Pennsylvania Avenue, NW**
**Washington, DC 20530-0001**

**U.S. District Attorney – D.C.**
**Civil Process Clerk**
**601 D Street, NW**
**Washington DC 20579**

_____

## COMPLAINT FOR EQUITABLE RELIEF AND COMPENSATORY DAMAGES

COMES NOW, Katrina Kelly, (hereinafter "Plaintiff") by and through undersigned counsel, and submits this Complaint against Defendant Markwayne Mullin, Secretary of the Department of Homeland Security (hereinafter "Defendant" or "DHS") and alleges as follows:

### INTRODUCTION

1.    This is an action authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. ("Title VII"), the Age Discrimination in Employment Act of 1967, the Rehabilitation Act of 1973, 29 C.F.R. Part 1614, and all applicable federal statutes

prohibiting discrimination, harassment, and retaliation in the federal government for the Defendant's unlawful discrimination, harassment, disability-related wrongdoing, and reprisal at the Department of Homeland Security, Federal Emergency Management Agency.

2.     Plaintiff previously pursued these claims through Agency Case No. HS-FEMA-02434-2023 and EEOC Hearing No. 531-2024-00233X.

3.     On February 9, 2026, the EEOC Administrative Judge entered judgment for the Agency, and on April 16, 2026, DHS issued a Final Order fully implementing that decision and advising Plaintiff of her right to file a civil action in federal district court.

## JURISDICTION AND VENUE

4.     This court has subject matter jurisdiction over this action pursuant to 42 U.S.C. §2000e 5(f)(3) (Title VII of the Civil Rights Act of 1964), 29 U.S.C. § 633a (Age Discrimination in Employment Act), and all other applicable federal statutes prohibiting discrimination, harassment, and retaliation in federal employment.

5.     Jurisdiction is further conferred by 28 U.S.C. § 1331, as this action arises under the laws of the United States, and by 29 C.F.R. Part 1614, which governs federal sector equal employment opportunity complaints.

6.     This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. §1343.

7.     Venue is proper in the District of Columbia Court pursuant to 28 U.S.C. §§ 1391(b) and (e) because Defendant transacts substantial business in this District, Defendants' principal places of business are in this District, and Defendant maintains employment records related to this action in the District of Columbia.

8.     Plaintiff brings this action within the time allowed by law.

## PROCEDURAL HISTORY

9.      Plaintiff has exhausted all her administrative remedies.

10.     Plaintiff exhausted the federal-sector administrative process by filing an agency EEO complaint on December 12, 2023, requesting a hearing before the EEOC.

11.     The accepted issues in the administrative case included allegations of harassment and discrimination based on race, color, sex, age, disability, and reprisal arising from twenty-two incidents between January 18, 2023, and October 1, 2024.

12.     Plaintiff litigated summary judgment, and on February 9, 2026, the EEOC Administrative Judge entered judgment for the Agency. On April 16, 2026, DHS issued a Final Order fully implementing that decision.

## PARTIES

9.      Ms. Katrina Kelly ("Plaintiff" or "Ms. Kelly") is a Black, female employee born in 1981. She has mental and physical disabilities. She is a former employee of FEMA and was employed by the Agency since on or about October 19, 2008 until December 1, 2025. During the period at issue she worked as a Policy Analyst (Career Conditional), and from August 30, 2020, through her termination she served as a CORE Program Analyst.

10.     Defendant is Markwayne Mullin, Secretary of the Department of Homeland Security. Mr. Mullin is sued in his official capacity.

## FACTUAL ALLEGATIONS

11.     In March 2022, Plaintiff underwent elective surgery that did not go as planned, remained hospitalized until June 2022, and did not return to work until January 2023. Following this procedure, and as a result of the procedure, Ms. Kelly developed and was diagnosed with PTSD.

12.    Upon Ms. Kelly's return to work in January 2023, she experienced a number of issues with her direct supervisor, David Grecco ("Mr. Grecco") where he refused to acknowledge and respond to her, often times being extremely dismissive of her.

13.    On January 18, 2023, Plaintiff emailed David Grecco asking whom she should report to as her section chief, and he did not respond.

14.    On March 2, 2023, Plaintiff reached out to Ms. Grecco to seek help with PIV-badge issues. She informed Mr. Grecco that the IT department advised her that her supervisor should contact the badging office to resolve the issue. Mr. Grecco said supervisors did not get involved in these matters and referred her to speak to Clifford Brown (Black, male).

15.    On April 19, 2023, Plaintiff learned that management had changed Plaintiff's priorities from Public Assistance Policy Analyst work to trainer duties.

16.    On May 3, 2023, Plaintiff had a "touch base" meeting with Clifford Brown (Black, male) and Myeesha Morris (Black, female), and was advised the meeting was on behalf of Leadership (i.e. Mr. Grecco).

17.    On May 10, 2023, during a follow-up with Mr. Brown, Mr. Brown revealed to Plaintiff that a case was being made against her for her termination.

18.    These were instances where Black employees were solicited to communicate with Plaintiff where Mr. Grecco did not want to communicate with her directly. This is another example of Mr. Grecco being non-responsive to Plaintiff.

19.    On or about May 12, 2023, Plaintiff had a performance review with Mr. Grecco where he told her that she needed to do more work as a GS-13. This instruction was given at the same time that Plaintiff was working on implementing equity requirement language in the Public Assistance Policy Guide and she believes that played a factor in Mr. Grecco's attempts to

undermine her. Ultimately, a performance review was issued, but the expectations that were listed in the performance review were not discussed in the meeting with Mr. Grecco.

20.    On or about May 18, 2023, Plaintiff requested a reasonable accommodation from Mr. Grecco to include: an ergonomic chair, an ergonomic keyboard, an ergonomic mouse, a fan, flexible duty hours, parking, telework, and the ability to attend 100% of her doctor appointments / medical treatment.

21.    On or about May 25, 2023, Plaintiff requested ADR between herself and Mr. Grecco.

22.    On or about June 8, 2023, Mr. Grecco invited Whitney Harris to a one-on-one performance meeting between himself and Plaintiff over Plaintiff's objections.

23.    Following that incident, Plaintiff reached out to FEMA Office of Professional Responsibility to allege David Grecco had subjected her to disparate treatment.

24.    Plaintiff had to take off from work between August 13, 2023, and September 23, 2023, to have a follow up procedure related to her 2022 medical emergency.

25.    Plaintiff understood that she had leave donated to her during this time period. She followed up with Mr. Grecco inquiring about that donated leave, but again he never responded to her.

26.    On or about September 11, 2023, Plaintiff sent a request to Mr. Grecco to use annual leave for a medical necessity. Instead, she was placed on LWOP for pay periods 17, 18 and 19.

27.    On September 15, 2023, Plaintiff's medical advocate reached out to Mr. Grecco to inquire about efforts to manage any leave donated to Ms. Kelly. Mr. Grecco was non-responsive to this request.

28.     On October 5, 2023, Plaintiff put in a request for reasonable accommodation associated with her PTSD, Psychiatric Disability Adjustment Disorder with Mixed Anxiety and Depressed Mood, and Ostomy bag. She requested Parking Space/Accessible Parking, Cubicle Near Restroom, Modified Work Schedule/ Flexible Work Schedule, Telework Schedule/Remote Work, Extended Breaks, Special Rest Area. Mr. Grecco never processed the reasonable accommodation while Plaintiff had the ostomy bag.

29.     Plaintiff was placed on LWOP for October 11, 2023 through October 15, 2023 despite the donated leave.

30.     On or about November 5, 2023, Eva Wilson became Plaintiff's first-line supervisor.

31.     Plaintiff perceived this to be done at the behest of Mr. Grecco in order to further insulate himself from Plaintiff.

32.     On November 28, 2023, an incident occurred where Ms. Wilson yelled at Plaintiff in front of her colleagues during a Teams meeting. Present during the meeting were: Amber Hood (White, female), Nathaniel Booth (White, male), Timothy Drake (White, male), Sean Duffy (White, male and Alexandra Kienker (White, female).

33.      Following the meeting, Plaintiff spoke with Ms. Wilson and Ms. Wilson told her she should just quit if she could not do her job.

34.     On December12, 2023, Plaintiff filed a Formal Complaint with EEO.

35.     Following the filing of the Formal Complaint in which Ms. Wilson and Mr. Grecco were named, Plaintiff continued to experience a discriminatory and hostile work environment, as well as retaliatory actions.

36.     On January 24, 2024, Plaintiff received a lower-than-expected performance review from Eva Wilson. Ms. Wilson was in no place to provide a performance review of Plaintiff as she

had only been her supervisor for less than 90 days at that point. Furthermore, the comments made by Ms. Wilson in in the performance review were inaccurate and inflammatory.

37.     On or about April 4, 2024, Ms. Wilson accused Plaintiff of not completing her work and of mishandling an IT computer issue.

38.     Ms. Wilson and Plaintiff had a meeting, where Plaintiff explained to Ms. Wilson that she was having issues with her computers, and Plaintiff wanted to be sure that she was aware of all the different versions of the document that Ms. Wilson created. Ms. Wilson responded that Plaintiff should Google how to troubleshoot the computer. This was contrary to procedure, which dictated that Plaintiff did not troubleshoot her own computer, and instead contact IT to troubleshoot computer issues.

39.     In or around May 31, 2024, Ms. Wilson began limiting how many job opportunities (training, details, other job opportunities, etc.) that Plaintiff could apply for. Ms. Wilson held a team meeting, with Katrina Kelly, Ms. Hood, Mr. Booth, Mr. Drake, Mr. Duffy and Ms. Kienker and explained that employees could only apply for two details because they need to consider the hiring offices and not to inundate them with applying for multiple positions at a time.

40.     In or around June 18, 2024, Ms. Wilson responded to Plaintiff's email agreeing to have all conversation recorded going forward, she then rescinded her office and stated Marc Tinsman would sit in on the performance review meeting as a mutual third party. Plaintiff expressed concerns about Marc Tinsman being that third party as he also reported to Mr. Grecco and as such could not be an impartial third party.

41.     In or around June 17, 2024, in a Teams meeting that was recorded, Ms. Wilson repeatedly pressed the mute button as Plaintiff was talking, not allowing her to be heard. This meeting included Plaintiff, Mr. Booth, Ms. Hood, Mr. Duffy and Ms. Kienker. During this

meeting, an argument began between Ms. Wilson and Ms. Kienker, Plaintiff raised her hand to try to give clarity on what she had understood Ms. Kienker's concerns to be. As Plaintiff was talking, Ms. Wilson kept pressing the mute button so that no one could hear Plaintiff's comments.

42.    Whitney Harris saw the video and made a complaint to the Office of Responsibility.

43.    In or around July 2024, when Plaintiff informed Ms. Wilson that she would be taking FMLA leave for medical reasons, Ms. Wilson instructed Plaintiff that she needed to provide a doctor's note with a handwritten signature, and if she did not, then Ms. Wilson would not approve the FMLA request. This was a purposeful misquoting of the Agency's FMLA policy. Plaintiff explained that the Agency's FMLA policy on unforeseeable leave permitted leave with a doctor's medical note, but did not require a handwritten signature on the doctor's note.

44.    As a result, Plaintiff had to use her own Annual Leave, as opposed to FMLA leave, to take the time off she needed.

45.    On or around October 1, 2024, when Plaintiff returned from approximately two months of FMLA leave, her coworkers had been reassigned, and she was left as the only person on her team reporting directly to Ms. Wilson.

46.    Ultimately Plaintiff was terminated by Ms. Wilson on December 1, 2025. Plaintiff has filed a wrongful termination claim at the EEO level which is currently pending investigation.

### COUNT I
**VIOLATION OF TITLE VII, THE AGE DISCRIMINATION IN EMPLOYMENT ACT AND THE REHABILITATION ACT of 1973 – DISCRIMINATION BASED ON RACE, COLOR, SEX AND DISABILITY**

47.    Plaintiff realleges and incorporates by reference each and every allegation in the preceding paragraphs.

48.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 633(a), prohibit federal agencies from discriminating against employees on the basis of race, color, sex, and age.

49.     The Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* uses the same standard as the American with Disabilities Act of 1990 ("ADA") / American with Disabilities Amendments Act of 2008 ("ADAA"), to determine whether a violation under the provisions of the act has occurred. The ADA prohibits discrimination based on disability. 42 U.S.C. §§ 12101-12117 *et seq*.

50.     The Rehabilitation Act (RA) precludes federal grantees from excluding, denying benefits to, or discriminating against any "otherwise qualified individual . . . solely by reason of her or his disability." 29 U.S.C. § 794(a).

51.     The Supreme Court has established a three-part, burden-shifting framework for analyzing claims of discrimination under Title VII. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)

52.     In *Webster v. U.S. Dep't of Energy*, 267 F. Supp. 3d 246 (D.D.C. 2017), the court applied the same formulation and noted that Rehabilitation Act discrimination claims use the McDonnell Douglas burden-shifting framework.

53.     Under this framework, a plaintiff must first establish a prima facie case of discrimination, typically showing that (1) they are a member of a protected class; (2) they were qualified for the position; (3) they suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination, such as more favorable treatment of similarly situated employees outside the protected class. *Id.*

54.     Here, Plaintiff is a black, female employee over the age of 40. She lives with mental (PTSD) and physical disabilities (related to surgery complications). She was qualified for her position as a CORE Program Analyst, and performed her duties throughout her tenure. The adverse employment actions she suffered include: management changing her duties, placing her on LWOP when she should have been on FMLA leave, lowering her rating or giving her unfavorable performance reviews, limiting her career opportunities, and isolating her while treating similarly situated coworkers more favorably.

69.     The factual record demonstrates that similarly situated employees -- such as Alexandra Kienker, Amber Hood, Timothy Drake, Sean Duffy, Christopher Kallenbach, Viggiano-Beltrocco, and Nathaniel Booth, who had the same first- and second-line supervisors -- were treated more favorably. They were not muted or berated in Teams meetings, were not subject to proxy communications, and received better performance outcomes or opportunities than Plaintiff did. This gives rise to an inference of discrimination.

70.     Once a prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. If the employer articulates a legitimate, non-discriminatory reason for its action, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S.248, 253 (1981).

71.     The evidence here demonstrates pretext: Plaintiff was treated differently, and with less respect than her comparators for similar conduct, and the Agency's explanations for its actions are undermined by the pattern of disparate treatment, failure to follow establish procedures, and the close temporal proximity to her protected activity.

72.     The Supreme Court has recognized that discrimination may be established under a "mixed-motive" theory by showing that a protected characteristic was a motivating factor in the employer's decision, even if other factors also played a role. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244–45 (1989); see also 42 U.S.C. § 2000e-2(m)

73.     The facts alleged support an inference that Plaintiff's race, sex, disability and age were motivating factors in the adverse actions taken against her.

74.     Defendants knew Plaintiff's race, age, disability and sex prior to the adverse actions and was aware, or should have been aware, of the discrimination she was subjected to.

75.     Other employees who were similarly situated were treated more favorably than Plaintiff with regards to terms and conditions of employment and workplace conditions.

76.     Plaintiff's race, age, disability and sex was a determining and motivating factor in Defendant's unlawful conduct.

77.     The reasons proffered by Defendant for its unlawful conduct are pretextual.

78.     Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

79.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of her race, sex, and age.

80.     Defendant discriminated against Plaintiff by engaging in, tolerating, or failing to prevent discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

81.    Defendant is directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the scope of their employment, under theory of *Respondeat Superior.*

82.    As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages– including, but not limited to, past and future loss of income, benefits, career opportunities, medical expenses, and costs – and is entitled to all available legal and equitable remedies.

83.    Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and her injury is permanent in nature.

84.    Defendants must comply with Title VII, ADEA and RA , but by and through their conduct, have violated Title VII, ADEA and RA.

## COUNT II
## VIOLATION OF THE REHABILITATION ACT –  FAILURE TO ACCOMMODATE

69.    Plaintiff realleges and incorporates by reference each and every allegation in the preceding paragraphs.

70.    The Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* uses the same standard as the American with Disabilities Act of 1990 ("ADA") / American with Disabilities Amendments Act of 2008 ("ADAA"), to determine whether a violation under the provisions of the act has occurred. The ADA prohibits discrimination based on disability. 42 U.S.C. §§ 12101-12117 *et seq*. They require employers to provide reasonable accommodation for an employee's known disabilities. 42 U.S.C. § 12112(b)(5)(A); *Shin v. Univ. of Md. Med. Syst. Corp.*, 369 F. App'x 472, 479 (4th Cir. 2010) (quoting 42 U.S.C. § 12112(b)(5)(A)).

71.    To state a plausible failure-to accommodate claim, the plaintiff must aver some facts to show that (1) she is an individual who had a disability and is otherwise qualified for her position, (2) the employer had notice of her disability, (3) the plaintiff could perform the essential functions of the position with reasonable accommodation, and (4) the employer refused to make such accommodations. *Wirtes v. City of Newport News*, 996 F.3d 234, 238–39 (4th Cir. 2021) (citing *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013)).

72.    Plaintiff is an individual with a disability because she has PTSD and physical complications related to her failed elective surgical procedure.

73.    Plaintiff's disabilities qualify or regard as her having a medical condition that qualifies her as having a recognized impairment pursuant to the ADA / ADAA.

74.    At all relevant times, Defendant perceived and/or regarded Plaintiff as having a physical impairment.

75.    She was qualified for her position as a CORE Program Analyst, and performed her duties throughout her tenure.

76.    Plaintiff could perform the essential functions of the CORE Program Analyst position with reasonable accommodations.

77.    Defendant was aware of Plaintiff's disability and did not provide reasonable accommodations to include but not limited to: ergonomic equipment, parking, telework, flexible hours, medical-appointment leave, a cubicle near a restroom, extended breaks, and a rest area.

78.    When Plaintiff requested these reasonable accommodations, management did not respond to or process those requests while the needs were active.

79.     Defendant was aware of Plaintiff's mental impairment and disability status and did not provide reasonable accommodations, thereby violating Plaintiff's rights under the Rehabilitation Act, ADA/ADAA, and Title VII.

80.     As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages including, but not limited to, past and future loss of benefits, career opportunities, medical expenses, and costs and is entitled to all available legal and equitable remedies.

81.     Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and her injury is permanent in nature.

82.     The Defendant must comply with Rehabilitation Act, ADA/ADAA, MFEPA, and Title VII, and through their conduct, violated the law.

**COUNT III**
**VIOLATION OF TITLE VII, ADEA AND REHABILITATION ACT  - HOSTILE WORK ENVIRONMENT**

83.     Plaintiff realleges and incorporates by reference each and every allegation in the preceding paragraphs.

84.     To prevail on a hostile work environment claim, a plaintiff must show that (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment based on her protected status; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment; and (4) there is a basis for imputing liability to the employer. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–23 (1993). The conduct must be both objectively hostile or abusive and subjectively perceived as such by the plaintiff. *Id.* at 21–22

85.    Plaintiff was subjected to management that repeatedly refused to communicate directly with her, used intermediaries, yelled at her in front of coworkers, told her to quit, muted her during meetings, and left her isolated after reassigning coworkers.

86.    These actions were unwelcome and based on race, color, sex, and age. The conduct was severe and pervasive, resulting in emotional distress, financial hardship, and material changes to the terms and conditions of her employment.

87.    In *Harris v. Forklift Systems, Inc.,* the Supreme Court held that workplace conduct violates Title VII when it is "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment."510 U.S. at 21.

88.    The standard is both objective and subjective: the conduct must be such that a reasonable person would find it hostile or abusive, and the plaintiff must in fact perceive it to be so. *Id*.at 21–22.

89.    The cumulative effect of the exclusion, isolation, and differential treatment described meets this standard.

90.    The Agency was aware of the conduct and failed to take effective remedial action, establishing a basis for employer liability.

91.    The actions and conduct described herein would have detrimentally affected a reasonable person of the same protected classes in Plaintiff's position.

92.    Defendants knew or should have known of the harassment, discrimination, and disparate treatment described herein. Defendant has failed to address the problems and further ailed to implement effective and appropriate measures to stop these acts.

93.     Defendants are directly liable for the discriminatory acts of their agents, servants, and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

94.     By failing to conduct a prompt and thorough investigation of Plaintiff's allegations of harassment; failing to redress the discrimination and harassment of Plaintiff; by consciously failing to protect Plaintiff from discrimination and harassment; and by punishing Plaintiff for her complaints of harassment, Defendant exacerbated the hostile work environment suffered by Plaintiff, and intentionally discriminated against Plaintiff in violation of Title VII, the ADEA and the Rehabilitation Act.

95.     Defendants' actions, and failure to act amounted to discrimination under Title VII the ADEA and the Rehabilitation Act.

96.     This hostile work environment was so severe and pervasive that it interfered with Plaintiff's ability to perform her job, causing emotional distress and economic harm.

**COUNT IV**
**VIOLATION OF TITLE VII, ADEA AND REHABILITATION ACT – RETALIATION**

97.     Plaintiff realleges and incorporates by reference each and every allegation in the preceding paragraphs.

98.     Title VII, ADEA and Rehabilitation Act prohibit retaliation against employees who engage in protected activity, such as opposing discrimination or participating in EEO investigations. To establish retaliation, a plaintiff must show: (1) engagement in protected activity; (2) employer awareness of the activity; (3) a materially adverse action; and (4) a causal connection between the protected activity and the adverse action. *Burlington N. & Santa Fe Ry.*

*Co. v. White*, 548 U.S. 53,67–68 (2006). An action is materially adverse if it might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Id*. at 68.

99.    Plaintiff engaged in protected activity by seeking ADR, pursuing EEO relief, filing the administrative complaint underlying this case, and reporting hostile conduct to management. Supervisors and management officials were aware of her activity. She subsequently suffered adverse actions, including continued or intensified adverse treatment through lower ratings by management, limitations on opportunities, meeting restrictions, LWOP issues, and team isolation.

100.    In *Burlington Northern & Santa Fe Railway Co. v. White*, the Supreme Court held that an adverse action in the retaliation context is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 68.

101.    The actions taken against Plaintiff satisfy this requirement - continued or intensified retaliatory treatment by Defendant through lower ratings by management, limitations on opportunities, meeting restrictions, LWOP issues, and team isolation.

102.    The record demonstrates a consistent pattern of disparate treatment as to Plaintiff and more favorable treatment as to similarly situated employees.

103.    Other members of Plaintiff's team, such as Alexandra Kienker, Amber Hood, Timothy Drake, Sean Duffy, Christopher Kallenbach, Viggiano-Beltrocco, and Nathaniel Booth, who had the same first- and second-line supervisors were treated more favorably. They were not muted or berated in Teams meetings, were not subject to proxy communications, and received better performance outcomes or opportunities than Plaintiff did.

104.    The actions and conduct described herein would have detrimentally affected a reasonable person of the same protected classes in Plaintiff's position.

105.    Defendants knew or should have known of Plaintiff's allegations described herein. Defendant failed to address the problems and further failed to implement effective and appropriate measures to stop these acts.

106.    Defendants are directly liable for the discriminatory acts of their agents, servants, and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

107.    Defendants' actions, and failure to act amounted to retaliation under Title VII, ADEA and the Rehabilitation Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests judgement against Defendant as follows:

A. Enter a declaratory judgement finding that Defendant's actions violated Title VII. the ADEA, and the Rehabilitation Act;

B. Enter a permanent injunction directing Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct;

C. Award compensatory damages in the amount of $1,000,000 including

    i. Lost wages and benefits;

    ii. Loss of promotional potential and career advancement;

    iii. Damage to professional reputation;

    iv. Emotional distress

D. Award punitive damages;

E. Award attorneys' fees and costs; and

F. Grant such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

Dated: June 17, 2026

Respectfully submitted,

**/s/ *Dionna M. Lewis, Esq.***

Dionna M. Lewis, Esq.
District Legal Group, PLLC
700 Pennsylvania Ave, SE, Suite 2098
Washington D.C. 20003
Phone: (202) 486-3478
dionna@districtlegalgroup.com
*Counsel for Plaintiff*